IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DEILDRICK CARROLL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:18-cv-495-WKW-WC |
| | ) | |
| LEAR CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.   INTRODUCTION

On May 15, 2018, Deildrick Carroll ("Carroll" or "Plaintiff") filed a Complaint (Doc. 1) alleging claims for employment discrimination, retaliation and hostile work environment in violation of his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, *et seq*. (West).  Plaintiff sued his current employer, Lear Corporation ("Lear" or "Defendant").  Presently before the court is Defendant's Motion for Summary Judgment (Doc. 21,) Plaintiff's Response (Doc. 24), and Defendant's Reply (Doc. 26).  The District Judge has referred this matter to the undersigned United States Magistrate Judge "pursuant to 28 U.S.C.A. § 636 for further proceedings and determination or recommendation as may be appropriate."  Doc. 14.  The motion is fully briefed and is ripe for recommendation to the United States District Judge.  For the reasons that follow, the undersigned RECOMMENDS that Defendant's Motion for Summary Judgment (Doc. 21) be GRANTED.

## II.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  Only disputes about material facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).   "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

Under Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

If the nonmovant "fails to properly address another party's assertion of fact" as required by Rule 56(c), then the court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2) & (3).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant.  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255.  However, "mere conclusions and unsupported factual

allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).   Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249–50 ("If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

## III.   STATEMENT OF FACTS

In the Court's Order setting guidelines for the filing of dispositive motions, the parties were directed, prior to filing dispositive motions and responses thereto, to "confer and agree upon the facts which are uncontested," and were further advised that the court would "rely upon the parties' representations in its determination of whether there is a genuine issue of material fact."   Doc. 16 at § 5.   The Parties have presented a lengthy statement of "Uncontested Facts."   *See* Docs. 22 at 1–6; 25 at 2–7.   Upon review, the undersigned finds that the Parties' statement of undisputed facts is supported by the evidentiary materials provided by Parties.   Therefore, the undersigned concludes that the Parties' statement of undisputed facts is due to be adopted by the court as uncontested for purposes of the Motion for Summary Judgment.   That statement of uncontested facts, edited lightly for content and for purposes of formatting and incorporation into this Recommendation, is as follows:

Defendant Lear Corporation is an automotive supplier. (Ex. 1: Carroll Dep. at 31:16–18).[1] Lear employs Carroll at its Montgomery, Alabama facility. (*Id.* at 31:19–20).

At the Montgomery plant, Lear manufactures automobile seats on a just-in-time ("JIT") basis for Hyundai Motor Manufacturing of Alabama Corporation. (*Id.* at 31:22–32:15). Under the JIT method of production, Lear receives an order from Hyundai regarding the number and types of seat it requires. (*Id.* at 33:5–9). The seats assembled at the Montgomery facility are then delivered directly onto Hyundai's assembly line. (*Id.* at 32:16–33:1). Lear has a short time frame to deliver the seats to Hyundai. *Id.* at 34:16–21. It is "very tight." (*Id.* at 33:21).

On July 2, 2012, at the start of his employment with Lear, Carroll received a copy of Lear's Employee Handbook. (*Id.* at 36:15–18; Ex. 2: Acknowledgment of Receipt of Employee Handbook). On October 27, 2015, Carroll received a copy of Lear's updated Employee Handbook. (Ex. 1: Carroll Dep. at 38:21–39:17; Ex. 3: Acknowledgment of Receipt of Employee Handbook). The Employee Handbook includes Lear's Equal Employment Opportunity Policy and its Harassment Free Workplace Policy. (Ex. 4: Employee Handbook Excerpts, pp. 11 & 13). Both policies are also posted at the plant. (Ex. 1: Carroll Dep. at 136:2–5). The Employee Handbook also includes Lear's four-step progressive corrective action policy for minor violations as follows:

- 1st Violation - Verbal Warning;

- 2nd Violation - Written Warning;

---

[1] All citations to exhibits are references to Defendant's exhibits that are attached to their Motion for Summary Judgment. *See* Doc. 23.

- 3rd Violation - 3 Day Suspension; and

- 4th Violation - Termination.

Serious violations automatically receive at least a 3 Day Suspension. (Ex. 4, p. 33).

Because of the JIT nature of the Montgomery plant, it is important that employees arrive on time for the start of their scheduled shift. (Ex. 1: Carroll Dep. at 35:18–22). Lear's Handbook has an Attendance/Personal Hours policy. (Ex. 1: Carroll Dep. at 39:18–23; Ex. 4, pp. 22–26). Carroll is familiar with the Attendance Policy. (Ex. 1: Carroll Dep. at 40:1–3). The Attendance Policy requires that employees notify a call line (called "Quest") before the start of their shift when they are going to be tardy or absent for any reason. (Ex. 1: Carroll Dep. at 40:5–8; Ex. 4, pp. 23, §1.2 & 24, §2.2.2). However, Lear also has an informal policy that employees do not have to call Quest if they are going to be less than thirty minutes late. (Ex. 1: Carroll Dep. at 41:1–6). When an employee fails to abide by the Attendance Policy, "[a]ppropriate corrective action is taken at the level sufficient to address attendance concerns." (Ex. 4, pp. 23, §2).

Lear employs Carroll as a maintenance technician. (Ex. 1: Carroll Dep. at 30:22–31:5). At some point after he commenced his employment, Carroll reported to Michael Clements, who was both the Engineering Manager and Maintenance Supervisor. (*Id.* at 48:3–8). Clements is white. (*Id.* at 93:5–7). On June 26, 2017, Michael Cassebaum assumed the role of Maintenance Supervisor and Clements remained as Engineering Manager. (*Id.* at 48:22–49:9; Ex. 5: Verified Statement of Debbie Owens at ¶9). After assuming this role, Cassebaum became Carroll's primary supervisor, (Ex. 1: Carroll Dep.

at 49:13–16), and Carroll had less contact with Clements. (*Id.* at 112:14–17). Carroll got "along quite well with Mike [Cassebaum]." (*Id.* at 49:19–22).

Carroll commenced his employment on July 2, 2012. (Ex. 1: Carroll Dep. at 30:18–21). Between July 2012 and July 2017, Carroll worked on the third shift. (Ex. 1: Carroll Dep. at 54:11–14). The third shift operates from 10:15 p.m. to 6:30 a.m. (*Id.* at 42:4–8). On occasion, Carroll is required to work overtime. (*Id.* at 43:5–7). As a JIT supplier, Lear has to match Hyundai's schedule. (*Id.* at 64:19–22). This means if Hyundai works extra hours on a shift, Lear has to work extra hours on a shift. (*Id.* at 64:23–65:8). On Friday, April 7, 2017, Carroll was working on the third shift. That shift carried over to Saturday, April 8, 2017. (*Id.* at 96:14–21). During the April 7, 2017, shift that carried over to April 8, 2017, Carroll was aware that Lear had advised the production employees they had to work past their normal quitting time. (*Id.* at 97:21–98:1). Maintenance employees like Carroll are required to support the production employees. (*Id.* at 98:2–5). Because production was working past their quitting time, "a maintenance team member needed to be there to assist production." (*Id.* at 98:9–11).

"Line time" is the time the production associates may stop production for their shift. (*Id.* at 67:11–68:6). Each day, the production supervisors advise the production associates what the line time is for their shift that day. (*Id.* at 67:18–22). During each shift, maintenance needs to remain at work during the time the production line is running until "line time" has been called. (*Id.* at 68:12–20). On April 8, 2017, Carroll left work before the third shift had finished with its production (*Id.* at 96:22–97:4) and before line time had been called. (*Id.* at 98:18–23). Carroll contends that the first shift maintenance team leader

7

told him he could leave for the day. (*Id.* at 99:1–9). The team leader is an hourly employee. (*Id.* at 45:3–6). Carroll acknowledges that maintenance employees must contact the production leaders to confirm that they may leave for the day. (*Id.* at 101:18–102:3). Carroll does not know what time the other third shift maintenance employees left on April 8, 2017. (*Id.* at 101:12–17).

Lear issued Carroll a Corrective Action for leaving the line early on April 8, 2017 without having contacted the production leaders. (*Id.* at 95:6–96:12, 102:11–20; Ex. 6: April 8, 2017 Corrective Action). The Corrective Action resulted in Carroll serving a three-day suspension. (*Id.*) When asked if he believed the Corrective Action was issued because of his race, Carroll answered: "Only thing I can come up with." (Ex. 1: Carroll Dep. at 106:3–4). When asked why he thought that, Carroll answered: "I don't know what make a person dislike another person. I can't tell you why they would dislike another person, but I do believe strongly that was the case with me, anyway." (*Id.* at 106:9–13). When asked if he had any other reason why he thought the Corrective Action was issued because of his race, Carroll replied: "No, sir." (*Id.* at 106:18).

On April 25, 2017, Carroll filed EEOC Charge #420-2017-01722 ("EEOC Charge") alleging that his April 8, 2017, discipline was unlawful because Lear treated him differently because of his race. (Ex. 7). Carroll did not discuss the EEOC Charge with anyone at the plant, including anyone in management. (Ex. 1: Carroll Dep. at 85:9–12).

Effective July 31, 2017, Carroll, at his request, transferred to the first shift. (Ex. 1: Carroll Dep. at 52:14–54:1). The first shift operates from 6:15 a.m. to 2:15 p.m. (*Id.* at 54:19–55:1). On August 23, 2017, Carroll arrived an hour to an hour and a half late to

work because he overslept. (*Id.* at 127:2–17).  He did not call the Quest line. (*Id.* at 128:2–3). Instead, he sent a text message to a maintenance team leader. (*Id.* at 4–8).  The next step under the progressive corrective action policy was discharge. (*Id.* at 128:13–16).  Lear, however, did not discharge Carroll. (*Id.* at 128:17–19).  Instead, Lear issued Carroll a Corrective Action and suspended him for three days. (*Id.* at 111:10–112:5, 129:1–3; Ex. 8: August 23, 2017 Corrective Action).  When asked if he alleges that the August 23, 2017, Corrective Action was issued because of his race, Carroll replied "I certainly hope not" and "I'm not sure." (Ex. 1: Carroll Dep. at 134:15–135:1).  The August 23, 2017, Corrective Action was the last Corrective Action that Carroll received. (Ex. 1: Carroll Dep. at 135:2–4; Ex. 5: Owens Statement at ¶12).

During his employment at Lear, no one has made any racially derogatory comments to Carroll. (Ex. 1: Carroll Dep. at 84:4–7).  During his employment at Lear, Carroll has never heard anyone make any racially derogatory comments: "No, I haven't heard anyone say that." (*Id.* at 84:8–12).  Clements voluntarily terminated his employment on May 3, 2018. (Ex. 5: Owens Statement at ¶8).  Carroll's work environment has gotten much better since Clements terminated his employment with Lear. (Ex. 1: Carroll Dep. at 94:8–13). Things at work "are a lot better now . . . . In a good way." (*Id.* at 94:10–13).

## IV.   DISCUSSION

Plaintiff's Complaint alleges Title VII claims for race discrimination, retaliation, and hostile work environment based upon the events described previously.

Specifically, in Count One, Plaintiff claims that he was discriminated against on the basis of his race when he and "Raymond Smith, the only other African-American

maintenance technician on third shift, were suspended for three (3) days by Lear's Engineering Manager, Michael Clements, a Caucasian male, for 'job abandonment.' Mr. Clements stated that Carroll and Smith 'had left our shift early without informing the plant supervisor.'" Doc. 1 at 3. He alleges that a few weeks prior similarly situated "Jeff Corbin, and Joseph Lejeune, two Caucasian maintenance technicians, left work early before their shift was over, and they were not disciplined, written up, or suspended." Doc. 1 at 3. Plaintiff also alleges disparate treatment in internet research access, access to certain assignments, and access to vacation leave. Doc. 1 at 3–4. In Count Two, Plaintiff claims that Defendant retaliated against him for his filing of a charge of discrimination by suspending him another three days "[l]ess than four months after filing his charge of discrimination." Doc. 1 at 5. Plaintiff was suspended after receiving "an 'Assertive Corrective Action Record' for not calling into the 'Lear Quest Line' to report he was running late for work. Mr. Carroll did, however, contact Pat Rance, Lear's first shift team leader, informing him that he was running late." Doc. 1 at 5. Plaintiff alleges that Caucasian employees were "often late and/or experienced no shows for work but were not required to contact the Lear Quest Line." Doc. 1 at 5. In Count Three, Plaintiff alleges that "Defendant's conduct has become a condition of his continued employment and that the conduct is pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, and/or abusive." Doc. 1 at 8.

Defendant seeks summary judgment on all three of Plaintiff's claims, arguing that Plaintiff has failed to establish a *prima facie* claim for race-based discrimination or retaliation under Title VII and, even if he could establish a *prima facie* claim of

discrimination or retaliation, he is unable to rebut Defendant's legitimate non-discriminatory and non-retaliatory reasons for its employment decisions.  Doc. 22 at 7–14.  Additionally, Defendant asserts that Plaintiff failed to exhaust his administrative remedies regarding his hostile work environment claim.[2]  Doc. 22 at 14–18.  The court will examine each of Plaintiff's claims within the legal framework applicable to such claims.

### A.      Title VII Discrimination Claims

#### 1.      Legal Standards

A Title VII disparate treatment claim premised on race requires a *prima facie* showing of discriminatory intent, *E.E.O.C. v. Joe's Stone Crab*, 220 F.3d 1263, 1286 (11th Cir. 2000), which "can be established three ways: 1) direct evidence; 2) circumstantial evidence; or 3) statistical proof." *Davis v. City of Panama City, Fla.*, 510 F. Supp. 2d 671, 681 (N.D. Fla. 2007) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)).  Plaintiff has not provided direct evidence that discrimination based upon his race was the reason for any alleged adverse employment action, nor has he proffered statistical evidence[3] or evidence of a pattern of discrimination in this case.  Because Plaintiff's discrimination claim therefore relies upon circumstantial evidence, the claim is

---

[2] Defendant also contends that any allegations of discriminatory conduct predating October 27, 2016, are time-barred as Plaintiff filed his first EEOC charge 180 days later on April 25, 2017. Doc. 22 at 7.  While Defendant's position is potentially meritorious, the Court ultimately need not determine whether such claims are exempted from the 180-day requirement pursuant to the continuing violation doctrine, *see, e.g., Greer v. Marco Warehousing, Inc.,* 179 F. Supp. 2d 1332, 1337–38 (M.D. Ala. 2001), because, for the reasons given below, Defendant is entitled to summary judgment on the merits of Plaintiff's discrimination claims.

[3] The court notes that while Plaintiff has provided statistical evidence it does not appear to be provided to establish a claim under the pattern and practice theory but, rather, it was provided "simply to bolster the circumstantial evidence of individual disparate treatment." *Cooper v. S. Co.*, 260 F. Supp. 2d 1305, 1311 (N.D. Ga. 2003), *aff'd*, 390 F.3d 695 (11th Cir. 2004).

analyzed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

Under the *McDonnell Douglas* framework, a plaintiff must first create a presumption of discrimination by establishing a *prima facie* case. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a *prima facie* case, then the "burden shifts to the employer to show a legitimate, non-discriminatory reason for its employment action." *Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citing *Joe's Stone Crab, Inc.*, 220 F.3d at 1286). If the employer does so, the burden shifts again to the plaintiff to "prove that the reason provided by the defendant is a pretext for unlawful discrimination." *Id.*

As noted above, "the plaintiff first has the burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally." *McCalister v. Hillsborough Cty. Sheriff*, 211 F. App'x 883, 884-85 (11th Cir. 2006). To establish a *prima facie* case for racially disparate treatment in violation of Title VII, the plaintiff must show that: "'(1) [he] belongs to a protected class; (2) [he] was qualified to do the job; (3) [he] was subjected to adverse employment action; and (4) [his] employer treated similarly situated employees outside of [his] class more favorably.'" *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1185 (11th Cir. 2019) (quoting *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)).

As to the third prong, the requirement of an adverse employment action, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001).

> [T]o support a claim under Title VII's anti-discrimination clause the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.

*Id.* The employee "must show a *serious and material* change in the terms, conditions, or privileges of employment" and "the employee's subjective view of the significance and adversity of the employer's action is not controlling." *Id.* Rather, a reasonable person in the same circumstances must find the employment action materially adverse. *Id.*

As to the fourth prong of the *prima facie* test, in order to identify a viable comparator, the Eleventh Circuit recently held that "a plaintiff proceeding under *McDonnell Douglas* must show that she and her comparators are 'similarly situated in all material respects.'" *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1226 (11th Cir. 2019). "Ordinarily, for instance, a similarly situated comparator—will have engaged in the same basic conduct (or misconduct) as the plaintiff; will have been subject to the same employment policy, guideline, or rule as the plaintiff; will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff; and will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28 (internal citations omitted). The comparison turns on "substantive likeness," essentially "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015)).

13

"This prevents 'courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" *Id.* (quoting *Burke-Fowler*, 447 F.3d at 1323).  Similarly,

> [I]n disciplinary contexts, the quality and quantity of a comparator's conduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing a reasonable decision by the employer. *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999).  While not always the case, differences in treatment by different supervisors or decisionmakers can seldom be the basis for a viable claim of discrimination. [*Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1259 n.5 (11th Cir. 2001)].

*Foster v. Biolife Plasma Servs., LP*, 566 F. App'x 808, 811 (11th Cir. 2014).  "*If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.*" *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), *abrogated by Lewis*, 918 F.3d 1213 (emphasis in original) (*Mack v. Great Atl. and Pac. Tea Co.*, 871 F.2d 179, 182 (1st Cir. 1989)).

Where a plaintiff succeeds in establishing a *prima facie* case of discrimination, under the *McDonnell Douglas* framework, the burden then shifts to the employer to provide "legitimate, nondiscriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  This burden is "exceedingly light," as the employer must merely proffer a non-discriminatory reason for the adverse employment action, not prove it. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (quoting *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983)).

Once the employer has proffered a legitimate nondiscriminatory reason for the adverse employment decision, the plaintiff "then has the ultimate burden of proving the

reason to be a pretext for unlawful discrimination." *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001).  In order to prove that a defendant's articulated reason is a pretext, a plaintiff must demonstrate not only that the reason is false, but also that intentional discrimination was the real reason. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (emphasis in original)).  To survive a motion for summary judgment, a plaintiff must rebut every legitimate, non-discriminatory reason for the employment decision. *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

2.    Application

Upon careful consideration of the Complaint, Defendant's motion and supporting memorandum, Plaintiff's memorandum in opposition to the motion, and the record evidence submitted by both parties, the undersigned concludes that Plaintiff has failed to establish a *prima facie* case of discrimination with respect to his complaint of discriminatory discipline by his employer.  Here, Defendant does not dispute that Plaintiff meets the first three elements: (1) as an African American, Plaintiff belongs to a protected class; (2) Plaintiff was qualified to do the job as evidenced by the fact that Plaintiff is still employed in the same position; and (3) Plaintiff's suspension is an adverse employment action.  Accordingly, the undersigned presumes for the purposes of summary judgment that those elements have been met and turns to determine whether Plaintiff has established the final element of the *prima facie* case—i.e., whether Defendant treated a similarly-situated employee outside of Plaintiff's protected class more favorably.

However, since Plaintiff's primary contention is that Defendant treated similarly-situated Caucasian employees more favorably in the application of discipline for a violation of work rules, Defendant cites to *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989), as the controlling standard.  In *Jones*, the Eleventh Circuit stated that to establish a *prima facie* case "in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." 874 F.2d at 1540 (citing *Moore v. City of Charlotte, N.C.*, 754 F.2d 1100, 1105–06 (4th Cir. 1985), *cert. denied*, 472 U.S. 1021 (1985)).

The Eleventh Circuit has since clarified that the *Jones* formulation included dicta, and that "no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998), *opinion superseded in part on denial of reh'g*, 151 F.3d 1321 (11th Cir. 1998).  The Eleventh Circuit then found that the "pertinent words in *Jones* demand not two, but three, elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff has engaged—either (a) disputedly or (b) admittedly—in misconduct similar to persons outside the protected class; and (3) that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment." *Id.* at 1311.

16

As previously stated, it is undisputed that Plaintiff is a member of a protected class. It is also not disputed that Plaintiff technically violated the work rules as set forth in the employee handbook. [4] *See* Doc. 23-1 at 11–12, Tr. 36:3–18, 38:21–41:6, 96:9–98:23. Thus, the court must determine if "similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment." *Jones*, 137 F.3d at 1311; s*ee also Nalls v. Corizon Health, Inc.*, No. 2:16-CV-391-WHA-SRW, 2017 WL 3446527, at *9 (M.D. Ala. Aug. 10, 2017) ("In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.") (citations omitted).

The Eleventh Circuit recently held that "a plaintiff proceeding under *McDonnell Douglas* must show that she and her comparators are 'similarly situated in all material respects.'" *Lewis*, 918 F.3d at 1226. "Ordinarily, for instance, a similarly situated comparator—will have engaged in the same basic conduct (or misconduct) as the plaintiff; will have been subject to the same employment policy, guideline, or rule as the plaintiff; will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff; and will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28 (internal citations omitted). The comparison turns on "substantive likeness," essentially "a plaintiff and her comparators must be sufficiently similar, in an

---

[4] Plaintiff does not cite to the *Bessemer* disparate disciplinary treatment framework, and does not specifically address each prong; however, the arguments provided in support of meeting the fourth element of the *McDonnell Douglas* framework are supported by the same set of facts.

objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young*, 575 U.S. at 229).

In *Lewis*, an African-American female police officer who had previously suffered a heart attack was restricted by her doctor from being in close proximity to pepper spray or a taser. *Id.* at 1219. She was placed on unpaid administrative leave and instructed to complete FMLA paperwork for her absence. *Id.* When she exhausted her accrued leave after a few weeks but still had not turned in her FMLA paperwork, her absence was deemed "unapproved," and she was terminated. *Id.* As comparators, she identified (1) a white male who was given 90 days of unpaid administrative leave after he failed a portion of a physical fitness exam, during which time he passed the test, and (2) a white male who was given 90 days of unpaid administrative leave after he failed the agility test but who was eventually terminated after 449 days on unpaid administrative leave because he was unable to demonstrate his fitness to be a patrol officer. The Eleventh Circuit stated that plaintiff's "broad-brush summary glosses over critical differences" in the other employees' situations, specifically, that plaintiff and her comparators were placed on leave years apart, pursuant to altogether different personnel policies, and for altogether different conditions. *Id.* at 1229. As a result, the officers were not similar in all material respects and were not valid comparators. *Id.*

The purpose of identifying a similarly-situated comparator is to find someone who did the same thing but was treated differently so as to justifiably give rise to an inference of discrimination. Thus,

Absent a qualitative comparison at the *prima facie* stage—*i.e.*, without determining whether the employer treated like cases differently—there's no way of knowing (or even inferring) that discrimination is afoot. Think about it: Every qualified minority employee who gets fired, for instance, necessarily satisfies the first three prongs of the traditional *prima facie* case. But that employee could have been terminated because she was chronically late, because she had a foul mouth, or for any of a number of other nondiscriminatory reasons. It is only by demonstrating that her employer has treated "like" employees "differently"—*i.e.*, through an assessment of comparators—that a plaintiff can supply the missing link and provide a valid basis for inferring unlawful *discrimination*.

*Lewis*, 918 F.3d at 1223.  Further,

[A] similarly situated comparator will have engaged in the same basic conduct or misconduct as the plaintiff, will have been subject to the same employment policy, guideline, or rule as the plaintiff, will ordinarily have been under the jurisdiction of the same supervisor as the plaintiff, and will share the plaintiff's employment or disciplinary history. [*Lewis*, 918 F.3d] at 1227–28.  A valid comparison turns "not on formal labels, but rather on substantive likenesses." *Id.* at 1228.  "An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—*e.g.*, who engaged in different conduct, who were subject to different policies, or who have different work histories." *Id.*

*Id.; see Menefee v. Sanders Lead Co., Inc.*, No. 19-10433, 2019 WL 4466857, at *3–4 (11th Cir. Sept. 18, 2019) (finding that plaintiff failed to show that comparators were similarly situated in all material respects, in part because they did not engage in the same type of behavior).

### a.    First Disciplinary Action

As fully set forth, *supra* at 6–8, Lear issued Carroll a Corrective Action for leaving the line early on April 8, 2017 without having contacted the production leaders, which

resulted in a three-day suspension.  Plaintiff alleges that Jeff Corbin and Joseph Lejeune, Caucasian maintenance technicians on the second shift, left work prior to Line Time being called on or about April 1, 2017, yet were not disciplined, written up, or suspended. Plaintiff has neither provided any additional information on Corbin or Lejeune nor provided any evidence that either of them left work prior to Line Time being called.  While the court assumes that Corbin and Lejeune are subject to the same policies, guidelines, and rules as Plaintiff, it is unknown if they are under the jurisdiction of the same supervisor, or if they share the same employment or disciplinary history.  Additionally, Plaintiff has not provided any evidence such as Corbin and Lejeune's time cards indicating that they left early, the time that Line Time was called on the shift in question, corrective action documentation, among others.  Plaintiff has not even explicitly alleged that management was aware that Corbin and Lejeune left work early, so it is left to the court to infer.  *See Amos v. Tyson Foods, Inc.*, 153 F. App'x 637, 647 (11th Cir. 2005) ("Employees are not 'similarly situated' if management is aware of one's improper conduct, but not aware of the others' conduct.") (citing *Gerwens*, 874 F.2d at 1542 (for his *prima facie* case, the plaintiff must show that his comparators' "known violations were consciously overlooked"); and *Bogle v. Orange Cty. Bd. of Cty. Comm'rs*, 162 F.3d 653, 658–59 (11th Cir. 1998) (an employee who may have broken a rule but was not caught was not similarly situated to one who had been caught)).

Defendant provided a sworn statement that it has reviewed Corbin and Lejeune's time cards and attendance records and that neither reflect that Corbin or Lejeune left work early in April of 2017. Doc. 23-1 at 116.  Neither party provided the court with time card

or attendance record evidence and Plaintiff does not provide the court with enough evidence to deduce that Corbin and Lejeune are similarly situated in all material respects. *See McCalister*, 211 F. App'x at 884–85 (stating that the plaintiff has the burden of establishing a *prima facie* case of discrimination).   Again, Plaintiff testified that he "believe[d] strongly" that this disciplinary action was based on his race, but this is insufficient to establish Corbin and Lejeune as similarly situated comparators.

### b.    Second Disciplinary Action

Regarding the second disciplinary action issued on August 23, 2017, after Plaintiff arrived an hour to an hour and a half late to work without calling the Quest line as required, Plaintiff agrees that the next step under the progressive corrective action policy was termination, but that Defendant chose to suspend him for three days instead. Doc. 23-1 at 34, Tr. 127:2–128:8, 128:13–129:3; Doc. 23-1 at 126–28.  Plaintiff was asked if he believes that the August 23, 2017, Corrective Action was issued because of his race, and Plaintiff replied, "I certainly hope not" and "I'm not sure." Doc. 23-1 at 36, Tr. 134:15–135:1. Plaintiff stated that, when Mike Cassebaum handed him the Corrective Action, he said "he kind of had to give me this write-up. He really don't know why I'm being wrote up for it, but he got to give me this write-up; I think that's basically what he told me. And I told him I understand. He said he didn't agree with it.  [. . .] He said you let the team leader know, but he didn't think it would have to be so harsh." Doc. 23-1 at 34, Tr. 129:4–23.  Plaintiff also testified that he was aware of the attendance policy as set forth in the employee handbook, including the policy that if an employee is going to be late, they are required to call the Quest line. Doc. 23-1 at 12, Tr. 38:21–40:10, 40:19–23.  However, Plaintiff noted

that there was a time period between 2015 and 2016 where the Quest line did not work. Doc. 23-1 at 12, Tr. 40:8–14.  Plaintiff also stated that there is an informal policy at Lear that if the employee is going to be less than thirty minutes late, they are not required to call the Quest line. Doc. 23-1 at 12, Tr. 41:1–6.

On September 7, 2017, Plaintiff filed his second EEOC Charge alleging that due to his August 23, 2017, Corrective Action and suspension he was subjected to race discrimination and retaliation for filing his April 25, 2017, EEOC Charge. Doc. 23-1 at 130–132.  Plaintiff alleges that Lorenzo Robinson, Earl (last name unknown), and Jermichael (last name unknown) were late or "no shows" for work and did not contact the Quest line. Doc. 23-1 at 131.  Plaintiff also testified that after receiving the Corrective Action he asked five employees about their experience with the Quest line.  He stated that none of the five employees knew the number to the Quest line and have not called the Quest line in the past. Doc. 23-1 at 35, Tr. 131:10–132:21.  Plaintiff identified the five employees he spoke with (Earl, Lorenzo, Jermichael, and two unnamed females) and admitted that all of them are African-American. Doc. 23-1 at 35–36, Tr. 133:1–134:14. Thus, these employees do not constitute "similarly situated, *nonminority employees (that is, persons outside the protected class)* received more favorable treatment." *Jones*, 137 F.3d at 1311 (emphasis added).

In his Complaint, Plaintiff identified Jesse Kilpatrick as a Caucasian employee who is often late or a "no show" and who was 30–45 minutes late just one-week before Plaintiff was suspended but was not suspended even though he failed to call the Quest Line. Doc. 1 at ¶ 19.  Defendant provided a sworn statement that it has reviewed Jesse Kilpatrick's time

cards and attendance records and that they reflect that "in August and September 2017, he was only late to work on August 10 and 14, 2017. These records also reflect that he was 10 minutes late on August 10, 2017 and 18 minutes late on August 14, 2017." Doc. 23-1 at 116–17. Neither party provided the court with time card or attendance record evidence for this employee.

Thus, Plaintiff has failed to produce sufficient affirmative evidence outside of his own self-servicing assertions that he engaged in "misconduct similar to persons outside the protected class" and that "similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment." *Jones*, 137 F.3d at 1311. Having failed to meet his burden of proving he was similarly situated to a more favorably treated employee, Plaintiff has not established a *prima facie* case on the allegations of disparate application of discipline for violations of work rules. *See Holifield*, 115 F.3d at 1562 ("*If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.*") (emphasis in original).

### c.   Plaintiff's Allegations of Non-Disciplinary Actions

Plaintiff also alleges additional discriminatory conduct by Defendant where he was argues he was treated less favorably than similarly situated Caucasian employees. For example, Plaintiff asserts that he was denied internet access to conduct work-related research without reason and that he observed Caucasian maintenance technicians using the internet. Docs. 1 at 3; 23-1 at 1234. Plaintiff also raises multiple incidents of angry outbursts and threats of discipline for actions that Caucasian employees would also do, but

not get yelled at.  Plaintiff further alleges that he was denied vacation leave time that he requested more than a week in advance, although, Caucasian employees "always seem to have their vacation leave requests approved no matter when they request the leave time." Docs. 1 at 3; 23-1 at 124.

However, these ancillary complaints only provide a general complaint with general statements that Caucasian employees were not disciplined in the same manner or subjected to hostility by his former supervisor, but no specific comparators are named.  For example, concerning the denial of internet access, Plaintiff claims Mike Clements prevented him from having computer access to research work issues. Doc. 25 at 10.  Plaintiff testified that there was a time in which he was blocked from using the internet at work and limited solely to checking e-mails. Doc. 23-1 at 20, Tr. 72:7–73:6.  However, Plaintiff admits that his internet access was restored after approaching the plant manager with the issue. Doc. 23-1 at 20–22, Tr. 73:7–79:5.  Other than a general statement that he observed unnamed Caucasian employees granted internet access while he did not have access, Plaintiff has not identified a single comparator that is similarly situated in all material respects.

Similarly, regarding the alleged incidents of angry outburst, Plaintiff cites to several instances of Mike Clements' angry outbursts directed at him.  For example, Plaintiff sent an e-mail to the plant manager that states:

> Mike Clements said to me that I used[d] to be a good maintenance tech but not anymore. [Clements said] I am going down a dangerous path. All of this happened Friday morning, because I told him that I was not going to sign the form. He persisted that I need to sign if not, there would be disciplinary action taken against me. I told Mike Clements that another pair of eyes will look at the form if he didn't mind. Mike Clements was outraged. Saying who? Who are you referring to? Mike Clements said to me, things I would not dare

repeat. Dan Drouin the environment is so hostile. Every day it is something
against or direct[ed] towards me. I can't focus on my daily task without being
harassed.

Docs. 25 at 11; 25-7 at 1; 23-1 at 156:5–159:6.  Additionally, following an incident that

occurred when Plaintiff attempted to clock out after working eight hours, Plaintiff sent a

second e-mail to the plant manager and copied the human resources manager, which states:

Good morning, first of all. I am informing you of the incident that happened
Saturday morning at 6:10 a.m. Mike Clements approached me.  Where I was
standing by my toolbox in my workstation.   While I was helping the
employees of the first shift. I was showing them what tools were required to
do the modification of the build pallets. Also, the correct method of what
needs to be modified.  Mike Clements was yelling at me about not working
12 hrs on a few work days.  He was very aggressive with screaming there
will be disciplinary action brought upon you. I don't feel safe around Mike
Clements. He was very persistent with his yelling and threats of disciplinary
action. I am afraid of Mike Clements because he is a loose cannon. I don't
know his intent for such threating actions. There isn't any security guards
here on site. I asked Mike Clements, Why would there be such actions taken
against me Second shift Maintenance has not work the first 12hr shift. Mike
Clements replied, that they finish all their work. You are on a 12hr shift that
you have to stay and work. Mike Clements asked was I going to stay for 12hr
to finish my shift for Friday night?  I responded no I am not going to stay.
Mike Clements was outraged of me saying no. You will have disciplinary
action taken against you. I responded, I was told all I have to work is 8 hrs.
Who told you that, Mike Clements was yelling. I was so embarrassed and
afraid that it took me a minute to respond. Mike Cassebaum told me that
along with my co-workers. All you have to work is 8 the other hours are
personal preference. Mike Clements became more aggressive with yelling
and his threats.  He was suggesting that the 3/8 drive 3/16 alien socket I had
in my hand to be a weapon.  I replied, I am showing the guys on first shift
the tools that are required to do the modification. I am standing at my toolbox.
Mike Clements that's all I know.  Why are you still here threating and
harassing me? I answered all your question. How am I harassing you, Mike
yelled?  Because you want [sic] leave and let me work I replied.  I will be
informing my legal representation of this retaliation incident that has
occurred.  These incidents are steadily more frequent and aggressive each
time.  I don't know what Mike Clements will do next. I am very afraid here
at Lear Corporation of all this retaliation from Mike Clements.

Docs. 25 at 11; 25-8 at 1.  Plaintiff also stated that Mike Clements would intentionally "nitpick," "try to get a rouse," or "frustrate" him, but he was unable to articulate specific examples. Docs. 25 at 10; 23-1 at 31, Tr. 115:5–18, 121:17–122:3, 124:18–126:19. Because Plaintiff has not identified a Caucasian employee who also refused to sign the acknowledgement of receipt of the Social Media Policy or who chose to work eight-hour shifts despite being scheduled for twelve-hour shifts and were not belittled in a similar manner by Mike Clements, he has failed to identify a similarly situated employee who was treated more favorably with respect to the outburst.

Finally, regarding the denial of vacation leave, Plaintiff argues that he was denied vacation time leave that he requested a week in advance, but that "Mr. Posey and Mr. Chapman always seem to have their vacation leave requests approved no matter when they request leave time." Docs. 23-1 at 124; 23-1 at 39, Tr. 148:19–149:2.  When questioned on this issue, Plaintiff testified there was "one instance" in which he requested vacation time to go deep-sea fishing for the first time. Doc. 23-1 at 39, Tr. 148:23–149:10.  However, Plaintiff admitted that his leave time was denied because they had a "launch" coming up, meaning that Hyundai was launching a new model and the plant would be shutdown to change over production for the new model launch. Doc. 23-1 at 39–40, Tr. 149:7–150:9. Plaintiff conceded that a new launch was a "pretty important" time, especially in taking time off.[5]  He identifies Matt Shed as an employee who was allowed to take time off during

---

[5] In Plaintiff's affidavit attached to his April 25, 2017, EEOC Charge, he identified Mr. Posey and Mr. Chapman as comparators; however, no evidence was submitted, and no testimony was provided on either comparator.  Instead, during his deposition, Plaintiff identified Mr. Shed as a comparator.

the launch, but he further stated that he does not know when Mr. Shed requested to take time off or how long he was actually off of work, stating that he did not check into it because he was disheartened that he missed his trip. Doc. 23-1 at 40, Tr. 151:5–14.  Based on this information alone, the court is unable to discern if Mr. Shed requested time off a week prior to the requested leave time as Plaintiff did, if Mr. Shed requested leave time after Plaintiff requested his, or if Mr. Shed requested months in advance prior to the launch being scheduled.  The Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination but has failed to provide the court with enough evidence to identify Mr. Shed as a comparator that is similarly situated in all material respects. *See McCalister*, 211 F. App'x at 884–85.

Upon a full review of the record, Plaintiff has not identified a single comparator who engaged in the same basic conduct or misconduct but was treated differently.  As such, he has failed to identify a valid comparator who is similarly situated in all material respects, and as with the two disciplinary actions, he cannot establish a *prima facie* case of disparate racial discrimination under Title VII. With respect to the ancillary complaints he makes.

Even if Plaintiff could establish a *prima facie* case with respect to his disparate discipline claim, Defendant has provided legitimate, non-discriminatory reasons for the suspensions that were administered to Plaintiff.  As set forth above, there is no dispute that Plaintiff violated the work rules as set forth in the employee handbook.  As Plaintiff has produced no evidence whatsoever beyond his own supposition that race had anything to do with Defendant's decision regarding Plaintiff's discipline, Plaintiff has not shown that a material factual dispute exists regarding whether Defendant's proffered justifications for

its actions, even if unsound or unwise, are mere pretext for racial discrimination. *See, e.g., Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) ("Title VII does not allow federal courts to second-guess non-discriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges. We are not a super-personnel department assessing the prudence of routine employment decisions, no matter how medieval, high-handed, or mistaken.  Put frankly, employers are free to [discipline] their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.") (quotations omitted).

For all of the foregoing reasons, Plaintiff has not established a *prima facie* case of discriminatory discipline with respect to the suspensions he received for not following Lear's policy.  Moreover, to the extent that Plaintiff could establish such a *prima facie* case, Defendant has provided legitimate, non-discriminatory reasons for its actions, and Plaintiff has wholly failed to produce any evidence that would rebut and disprove those reasons.  As such, summary judgment in favor of Defendant on Plaintiff's Title VII discrimination claim is appropriate.

### B.    Title VII Retaliation Claim

#### 1.    Legal Standard

Retaliation claims under Title VII are considered within the same burden-shifting framework as are discrimination claims under the statute.

> Title VII . . . prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 2000e-3(a). A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

*Crawford*, 529 F.3d at 970. If a plaintiff can establish a *prima facie* case of retaliation, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 n.6 (11th Cir. 2000). "If the defendant offers legitimate reasons, the presumption of retaliation disappears. The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." *Id; see also Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310–11 (11th Cir. 2016).

In order to establish an adverse employment action for purposes of a *prima facie* Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations omitted). This standard is "more liberal" than the standard for adverse employment actions under the discrimination provisions and, therefore, "'protects an employee from a wider range of conduct than the discrimination provision does.'"

*Crawford*, 529 F.3d at 974 (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 781 n.3 (7th Cir. 2006)).

With respect to the third prong, showing a causal connection between the statutorily protected expression and the adverse employment action, "'[t]o establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716–17 (11th Cir. 2002) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000). Close temporal proximity between the protected activity and the adverse action may be enough to establish that the protected activity and an adverse action were not wholly unrelated. *Id.* (citing *Bass v. Bd. of Cty. Comm'rs*, 256 F.3d 1095, 1119 (11th Cir. 2001)).

Even where a plaintiff establishes a *prima facie* case of retaliation, the plaintiff still must prove that the employer's desire to retaliate against the plaintiff was the "but-for" cause of the alleged retaliatory action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 359–60 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360.

## 2. Application

As fully set forth, *supra* at 8–9, Lear issued Carroll a second Corrective Action for not calling the Lear Quest Line to report that he was running late for work on August 23, 2017, which resulted in a three-day suspension. However, Plaintiff asserts that on July 25, 2017, he provided supplemental information, through his attorney, to the EEOC in response

to Defendant's position statement. Doc. 23-1 at 131.  Less than a month later Plaintiff was issued a second Corrective Action and suspended.  Plaintiff noted that out of eleven maintenance technicians, he is the only African-American still on staff.  He further noted that the only other African-American maintenance technician had also filed an EEOC Charge after leaving early with Plaintiff in April of 2017, and he was terminated on the same day Plaintiff received his second Corrective Action. Doc. 23-1 at 131.  Plaintiff indicated that the Corrective Action was provided to him in an envelope with a smiley face on it, which he understood to be taunting and retaliation. Doc. 23-1 at 132.

It is not disputed that Plaintiff meets the first and second prongs of the *prima facie* showing.  In filing the April 25, 2017, charge of discrimination with the EEOC, Plaintiff clearly engaged in protected activity under Title VII, and his August 23, 2017, unpaid three-day unpaid suspension is clearly an adverse employment action. *See Gillis v. Georgia Dep't of Corr.*, 400 F.3d 883, 887 (11th Cir. 2005) ("actions that affect compensation are considered adverse employment actions.").  However, the parties disagree as to the third prong of establishing a causal connection between the protected activity and the adverse employment action.

Defendant argues that Plaintiff "cannot establish a causal link between his April 25, 2017 EEOC Charge and his suspension nearly four months later." Doc. 22 at 15. Specifically, Defendant argues that Plaintiff has presented no evidence that the person taking the adverse action was aware of the EEOC charge and that the four-month gap between the EEOC Charge and the suspension is insufficient to establish temporal proximity. Docs. 22 at 15–16; 26 at 7–8.  Plaintiff responds that "Lear was aware that Mr.

Carroll had filed an EEOC charge" and that four months is enough to establish temporal proximity. Doc. 25 at 18–20.

The Eleventh Circuit has repeatedly held that "'[t]o establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" *Shannon*, 292 F.3d at 716–17 (quoting *Gupta*, 212 F.3d at 590); *see also Bass*, 256 F.3d at 1119 (holding that the plaintiff must show "that the person taking the adverse action was aware of the protected expression."); *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (holding that the requirement that the decision maker must be aware "rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him."); *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir. 1997) ("[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression [. . .]."). The Plaintiff even sets forth this requirement in their brief. *See* Doc. 25 at 18.

However, Plaintiff asserts that the causal link requirement is met because "Lear was aware that Mr. Carroll had filed an EEOC charge in April 2017." Doc. 25 at 19. Plaintiff has provided no evidence and does not even assert that Mike Clements (the decision-maker) or Mike Cassebaum (who was tasked with handing Plaintiff the August 23, 2017, corrective action notice) were aware of the April 25, 2017, EEOC Charge. In fact, Plaintiff testified that he did not discuss the fact that he filed the April 25, 2017, EEOC charge with anyone at Lear. Doc. 23-1, Tr. at 85:9–12 ("Q. Did you talk to anyone at Lear about this

EEOC Charge? A. No, I haven't talked to anyone about that.").  In the Verified Statement of Debbie Owens, the Human Resources Manager, she declares under penalty of perjury that "[o]utside of the Human Resources Department and the Plant Manager, Lear did not advise anyone at the plant, including Cassebaum and Clements, about either EEOC Charge." Doc. 23-1 at 117.  Plaintiff has not provided any evidence to dispute this claim.

Even assuming, *arguendo*, that the four-month gap meets the temporal proximity gap, Plaintiff's failure to provide evidence that Mike Clements or Mike Cassebaum were aware of Plaintiff's protected activity is fatal.  Thus, Plaintiff has not established a *prima facie* case with respect to his claim of retaliation.  As such, summary judgment in favor of Defendant on Plaintiff's Title VII retaliation claim is appropriate.

### C.  Title VII Hostile Work Environment

Plaintiff also asserts a hostile work environment claim alleging race-based harassment.

#### 1.     Exhaustion

First, Defendant argues that Plaintiff "never alleged racial hostile work environment in either of his EEOC Charges," and thus, his claim is due to be dismissed for failure to exhaust his administrative remedies. Doc. 22 at 14–16.  In order to exhaust his administrative remedies with respect to his Title VII discrimination claims, Plaintiff was required to file a "timely charge of discrimination with the EEOC." *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (discussing exhaustion requirement in Title VII context).  Accordingly, the Eleventh Circuit has instructed as follows:

> In order to litigate a claim for discrimination under Title VII . . . a plaintiff must first exhaust his administrative remedies, beginning with the filing of a charge of discrimination with the EEOC.  In a non-deferral state, such as Alabama, a plaintiff must file an employment discrimination charge with the EEOC within 180 days after the date of the alleged discrimination.  Failure to file a timely charge with the EEOC results in a bar of the claims contained in the untimely charge.
>
> Under Title VII . . . , a charge must be in writing under oath or affirmation and contain such information and be in such form as the [EEOC] requires. The EEOC requires that a charge be in writing and . . . verified.  A charge is verified when it is made under oath or affirmation.  The verification requirement is mandatory.

*Rizo v. Ala. Dep't of Human Res.*, 228 F. App'x 832, 835 (11th Cir. 2007) (internal quotations and citations omitted).  However, the "'specific words of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow.'" *Increase Minority Participation by Affirmative Change Today of Nw. Fla., Inc. (IMPACT) v. Firestone*, 893 F.2d 1189, 1196 (11th Cir. 1990) (quoting *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 460 (5th Cir. 1970)).  Rather, a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation that 'can reasonably be expected to grow out of the charge of discrimination,'" and "should not be strictly interpreted." *Ramon v. AT&T Broadband*, 195 F. App'x 860, 865 (11th Cir. 2006) (quoting *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (per curiam)); *see also Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989) ("We have refused, however, to demand such exhaustion in all situations, recognizing that literal compliance does not always effectuate the purpose of the requirement, which is to promote informal settlements.").

In *Ambus v. Autozoners, LLC*, the Honorable Judge W. Harold Albritton addressed an analogous fact pattern. 938 F. Supp. 2d 1225 (M.D. Ala. 2013). The court referred to guidance found in an unpublished Eleventh Circuit case, *Green v. Elixir Industris, Inc.*, 152 Fed. App'x 838 (11th Cir. 2005), where a plaintiff pled a hostile work environment claim in a judicial complaint, but only addressed facts related to his termination in the EEOC charge. *Id.* at 1230. The plaintiff in *Green* argued that he relayed information of harassing behavior to the EEOC investigator and provided additional paperwork evidencing the harassment, but the Eleventh Circuit held that was insufficient to overcome the exhaustion requirement "based on the facts as stated in the EEOC charge form." *Ambus*, 938 F. Supp. 2d at 1230 (citing *Green*, 152 Fed. App'x at 841). In *Ambus*, the court distinguished the facts before it and those before the *Green* court, finding that "[t]his is not, therefore, a case in which a plaintiff seeks to assert a hostile environment claim after only having identified a discrete employment action." *Id.* at 1231. The court cited to various references of harassing behavior contained within the EEOC charge and concluded that, even though not explicitly pled, "a claim of racial harassment could reasonably have been expected to grow out of the charges of racial discrimination." *Id.* The court denied the defendant's motion to dismiss the hostile environment claim under Title VII based on the failure to exhaust. *Id.*

The facts before this Court are more analogous to *Ambus* than they are to *Green*. In both of Plaintiff's EEOC charges, in addition to outlining the facts leading to his three-day suspensions and various acts of disparate treatment, Plaintiff also alleges that Caucasian employees attempted to deny him service calls, Caucasian employees made jokes that

Plaintiff interpreted as attempts to force his resignation, he did not apply for a team lead position because he was discouraged by the atmosphere, he was targeted and overly-criticized, and the envelope containing his notice of suspension contained a smiley face drawn on it, which Plaintiff interpreted as taunting.  Therefore, the Court finds that the facts as pled in the EEOC charges are sufficient to find that "a claim of racial harassment could reasonably have been expected to grow out of the charges of racial discrimination." *Ambus,* 938 F. Supp. 2d at 1231; *see also IMPACT*, 893 F.2d at 1196 ("We are convinced that it would be reasonable to investigate the employment examination issue based on the broad charges made by the plaintiffs.").  Accordingly, the Court finds that there are sufficient facts contained within the EEOC charges to conclude that Plaintiff has exhausted his administrative remedies as to the hostile work environment claim under Title VII.

### 2.      Legal Standard

Plaintiff bears the burden of proof in a hostile work environment claim.  A hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (internal citation and quotation marks omitted); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20 (1993).

To establish a *prima facie* case for a hostile work environment claim, Plaintiff must show that:  (1) he belongs to a protected group; (2) he has been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic, such as his race;

(4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such environment under either a theory of vicarious or of direct liability. *Miller*, 277 F.3d at 1275.

### 3.    Application

It is undisputed that Plaintiff is a member of a protected class, and the Court assumes *arguendo* that Mr. Clements' alleged angry behavior and co-workers' alleged actions were unwelcomed by Plaintiff. Thus, Plaintiff meets the first two factors necessary to establish a *prima facie* case. However, taking the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff cannot make out a *prima facie* case for hostile work environment based on the third and fourth factors.

#### a.    Whether the alleged harassment was based on Plaintiff's race.

Plaintiff's race-based hostile work environment claim is based on his allegation that his supervisor, Mike Clements, harassed him because he would "nitpick," "try to get a rouse," or "frustrate" the Plaintiff. *See* Docs. 25 at 10; 23-1 at 31, Tr. 115:5–18, 121:17–122:3, 124:18–126:19. This allegation cannot support a claim for a hostile work environment because Plaintiff has not shown that there was a racial element to the harassment. "Harassment not based upon a protected characteristic is generally not actionable." *Martinez v. Pavex Corp.*, 2006 WL 1823430, at *5 (M.D. Fla. June 30, 2006) (citing *McCollum v. Bloger*, 794 F.2d 602, 610 (11th Cir. 1986)); *see also Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (a plaintiff must establish he

was subjected to the harassment because of his protected class; an environment equally harassing for all races does not constitute a hostile work environment). "It is a bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII. Therefore, only conduct that is *based on* a protected category [. . .] may be considered in a hostile work environment analysis." *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1195 (11th Cir. 2016) (quoting *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1297 (11th Cir. 2012)).

To survive a summary judgment motion, Plaintiff needs to show that he was harassed because of his race. Plaintiff fails to meet this element of his *prima facie* case. As will be discussed in detail below, Plaintiff lodges various complaints about Mr. Clements' behavior throughout the record. These complaints include being "nitpick[ed]," being belittled, angry outbursts, threats of disciplinary action, yelling, being denied service calls, only favorite employees were given plant updates, and he felt discouraged from applying for a team lead position due to the environment. However, Plaintiff has admitted that during the entire duration of his employment, he has not heard anyone make racially derogatory remarks to Plaintiff or to anyone else. Doc. 23-1 at 23, Tr. 84:4–12. Plaintiff has also admitted that his work environment has gotten much better since Mr. Clements resigned from Lear. Doc. 23-1 at 26, Tr. 94:8–13.

On August 26, 2016, Plaintiff placed a call to Lear's Compliance Hotline and reported alleged discrimination by Mr. Clements.[6]  As a result of that call, Defendant launched an investigation and separately interviewed five employees, including Plaintiff. *See* Doc. 25-4.  Of the other four employees interviewed, three were Caucasian and one was African-American.  There was a clear consensus that Mr. Clements was a tough boss and demands a lot from his workers, but his aggressive behavior occurs across the board regardless of race. Doc. 25-4 at 2–3.  Lorenzo Robinson, the African-American employee who was interviewed, stated that he liked Mr. Clements and did not have any issues with him. Doc. 25-4 at 2.  He stated that Mr. Clements communicates with them and is a "straight shooter." Doc. 25-4 at 2.   Mr. Robinson also stated that Mr. Clements acknowledges accomplishments and that he does not tolerate non-performers as was often tolerated under previous supervision. Doc. 25-4 at 2.  He further stated that he does not "see where Mike has shown any racial discrimination toward anyone." Doc. 25-4 at 2.  The interviews with the three Caucasian employees were consistent with Mr. Robinson's. *See* Doc. 25-4 at 2–3.  While these statements were not sworn statements, they are certainly persuasive in explaining the atmosphere working for Mr. Clements.

In the interview following Plaintiff's phone call to Lear's Compliance Hotline with allegations of racial discrimination, Plaintiff stated:

> I feel there's a lot of negativity and a lot of things thrown my way. Mike singles me out. I got suspended and don't see the reason why. I feel that he should have got with the team leader. The corrective action was two weeks

---

[6] The hotline allows employees to make anonymous calls to the hotline; however, Plaintiff testified that he cannot recall if he gave his name or remained anonymous, but in the course of this litigation Plaintiff has admitted that he placed the call. *See* Doc. 23-1 at 36–37, Tr. 136:2–139:4.

later and he noted I was being written up for a safety violation. The PM doesn't state add any new bolts it says to just secure the current bolts and that's what I did but I received a discipline for it. I didn't get to attend the Gallup Survey meeting because I had to take off broken pallets. The first shift guys were coming in and just standing around doing nothing but I was told to do it thus missing the meeting. Chad the team lead didn't get written up for working on a piece of equipment that he didn't lock out. Mike was standing right there when it happened and didn't say anything to Chad nor issue him a write-up. There were some pallets that had broken bolts on it. Chad was working on it but didn't finish. I started working on it and Mike in a very harsh tone asked me why I was working on pallets when he didn't need me working on pallets. He didn't say anything to Chad when Chad was working on pallets but he said something to me. I just think he could have put it in a nicer tone and not belittle me.

Doc. 25-4 at 3.  All of the allegations lodged in Plaintiff's interview relate to disciplinary decisions made by Mr. Clements in response to work-related activities.  *See Stoudemire v. Opp Health & Rehab., LLC*, No. 2:16-CV-756-SMD, 2019 WL 3558040, at \*4 (M.D. Ala. Aug. 5, 2019) ("Comparisons of the severity of different types of workplace misconduct and how best to deal with them are the sort of judgments about which courts must defer to employers. Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.") (internal citations and quotations omitted).

Being told that you are no longer a good worker, being yelled at, being threatened with disciplinary action, interpreting a statement to mean they are attempting to force you to resign, etc., without more, does not demonstrate racial animus required to meet this factor.  *See Williams v. Ruskin Co., Reliable Div.*, No. 1:10-CV-508-WC, 2012 WL 692964, at \*14 (M.D. Ala. Mar. 1, 2012) ("being told Plaintiff has an 'attitude' does not necessarily indicate racial hostility.") (citing *Blick v. Pitney Bowes Mgmt. Servs., Inc.,* 1995 WL 791945, at \*5 (D. Mass. Dec. 26, 1995) (noting that a plaintiff's mere disagreement

with the employer's "assessment of his work attitude ... is not sufficient to create a triable federal discrimination claim")); *Baker v. FedEx Ground Package System Inc.,* 278 F. App'x 322, 329 (5th Cir. 2008) ("The phrases 'fired girl walking' and 'stupid' are not 'based on race' and, thereby, do not sustain a race-based hostile work environment claim."); *Allen v. Bake–Line Prods., Inc.,* 2001 WL 1249054, at *10 (N.D. Ill. Oct. 17, 2001) (finding that "being called 'stupid,' 'lazy,' a 'motherfucker,' a 'bitch' and the like are not probative of whether a racially hostile work environment existed because these type of statements are not racially motivated").

Plaintiff has failed to present evidence that Mr. Clements' angry outbursts contained racial animus.  As previously discussed, Plaintiff admits that during the entire duration of his employment he has not heard anyone make racially derogatory remarks directed toward Plaintiff or to anyone else.  Doc. 23-1 at 23, Tr. 84:4–12.  Plaintiff cannot simply provide conclusory statements and his own assertions or beliefs; he must provide evidence demonstrating that he was subjected to the alleged harassment *because* of his race.  Plaintiff has failed to do so.  Since Plaintiff produces nothing which suggests there was racial animus behind the allegations he makes, summary judgment in favor of Defendant on Plaintiff's hostile work environment claim is appropriate.

> **b.    Whether the harassment was sufficiently severe or pervasive.**

Assuming *arguendo* that Mr. Clements' angry outbursts and general treatment of the Plaintiff were based upon a protected characteristic, in order to survive a summary judgment motion, Plaintiff must also be able to point to specific evidence showing that the

alleged conduct was sufficiently severe or pervasive to alter the terms and conditions of his employment and create a discriminatorily abusive working environment. *See Miller*, 277 F.3d at 1275–76.

The requirement that the harassment be "severe or pervasive" under factor four contains an objective and subjective component. *Miller,* 277 F.3d at 1276; *Brantley v. City of Macon,* 390 F. Supp. 2d 1314, 1324 (M.D. Ga. 2005) ("To establish this fourth element of a hostile work environment claim, a plaintiff must demonstrate that 'the harassing conduct created both an objectively hostile or abusive environment-one that a reasonable person would find hostile-and a subjective[ly] hostile or abusive environment-one that the victim subjectively perceives to be abusive.'") (internal quotations and citations omitted). "'[A] plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe to alter the conditions of the victim's employment and create an abusive working environment.'" *Ramon*, 195 F. App'x at 865 (quoting *Harris*, 510 U.S. at 21). Indeed, "[i]t is the fourth element—sufficiently severe or pervasive harassment—that 'tests the mettle of most . . . harassment claims.'" *Alexander v. Opelika City Bd. of Educ.*, 2008 WL 401353, at *3 (M.D. Ala. Feb. 12, 2008) (quoting *Gupta*, 212 F.3d at 583). In evaluating the severity of the alleged harassment, there are four factors to be considered: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F .3d at 1276; *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).

Taking the evidence in the light most favorable to Plaintiff, the Court finds that the frequency of the alleged conduct is likely sufficient to meet the first factor. There are numerous accusations made throughout the record, and Plaintiff was very clear in his communications with the plant manager and human resource manager that Mr. Clements' angry and belittling treatment was frequent, and the frequency was increasing. Docs. 25-7 at 1; 25-8 at 1. However, Plaintiff's allegations, while certainly not an ideal environment, do not rise to the level of sufficiently severe or pervasive to alter the terms and conditions of his employment based upon the remaining factors.

The Supreme Court has held that the standard for bringing a hostile work environment claim is an exacting one and "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998)). Unfortunately for Plaintiff, the instances as alleged, considered individually and collectively, are not so objectively hostile or abusive that they fostered a severely and pervasively hostile working environment.

For the purpose of considering the hostile work environment claim, the Court will consider the previously discussed conduct involving both three-day suspensions, denial of internet access, vacation time, "angry outbursts," and intentional "nitpick[ing]," "try[ing] to get a rouse," or "frustrat[ing]" him. As previously discussed, *supra* at 26–27, Plaintiff sent an e-mail to the plant manager complaining of Mr. Clements' angry outbursts. Plaintiff stated that Mr. Clements told him he used to be a good worker but is no longer one, that if Plaintiff did not sign the Social Media Policy he would have to take disciplinary

action, that Mr. Clements got angry when Plaintiff indicated that he wanted a second person to review the policy before he signed it, that Mr. Clements said "things [Plaintiff] would not dare repeat," and that the environment is hostile and he could not focus on his tasks without being harassed. Docs. 25 at 11; 25-7 at 1; 23-1 at 156:5–159:6.  Plaintiff also sent a second e-mail to the plant manager, with a copy to human resources, following an incident after he attempted to clock out early.  Plaintiff stated that Mr. Clements yelled at him for not working his full twelve-hour shifts, got even angrier after Plaintiff indicated he did not plan to work a twelve-hour shift the next day, and indicated he was not comfortable or did not feel safe around Mr. Clements because he was very persistent in yelling and threatening disciplinary actions with increasing frequency.[7] Docs. 25 at 11; 25-8 at 1.

In addition to the above conduct, which the Court has already considered under Plaintiff's other claims, Plaintiff alleges two issues with preferential treatment in getting assignments and tasks.  First, Plaintiff states that he is "routinely denied service calls" because Caucasian maintenance technicians, Chad Posey and Phil Chapman, prevent him from responding to calls. Docs. 1 at 3; 23-1 at 123.  However, during his deposition, Plaintiff was asked if any of the other maintenance technicians tried to prevent him from responding to service calls. Doc. 23-1 at 40, Tr. 151:15–16.  Plaintiff initially responded "No, sir" and then clarified that "I wouldn't say they were -- keyed the radio quickly before they could get the incoming calls. [. . .] I mean, just key it.  Beat you to the button. [. . .]

---

[7] It should be noted that Defendant attempted to investigate the claims made in Plaintiff's e-mails; however, Plaintiff, admittedly, refused to cooperate during the attempted investigation. Doc. 23-1 at 41, 97, Tr. 153:1–156:1.

Before you get to your button, you know, they already answered it." Doc. 23-1 at 40, Tr. 151:21–152:10.  Plaintiff failed to provide any evidence to show that his co-workers were intentionally trying to prevent him from responding to service calls, but rather, he readily admits that his co-workers simply respond to the service calls faster than he is able to respond.

Additionally, Plaintiff alleges that Mike Clements had "his favorites," Caucasian employees Phil Chapman and Chad Posey, and would only directly assign them upcoming tasks, leaving Plaintiff to find out his tasks from other team members in maintenance or at the monthly meeting.  Docs. 25 at 10; 23-1 at 32, Tr. 118:13–122:3.  Plaintiff confronted Clements about his actions and asked "Why do you go there and you don't get us in a group and talk to us as a group because we're one team, one body, right, instead of segregating us like that?" Doc. 23-1 at 32, Tr. 119:12–20.  Clements denied doing so, to which Plaintiff responded "'Mike, perception-wise you are doing that. You just ask these other people. They see you.' And he was in such denial, I don't know." Doc. 23-1 at 32, Tr. 119:21–120:3.  Plaintiff contends that being made aware of the projects and the "direction the plant was going in" from Clements was important because there was no other management present during the third shift. Doc. 23-1 at 32, Tr. 120:4–14.  However, Plaintiff also testified the team leads send out daily e-mails to all maintenance technicians that inform them of updates for their shift and what occurred on other shifts. Doc. 23-1 at 19–20, Tr. 69:3–72:2. Plaintiff stated that he was always provided an opportunity to check his e-mails when he came in for his shift. Doc. 23-1 at 20, Tr. 71:18–72:2, 75:5–8.

Plaintiff also avers that due to feeling discouraged by the environment he refrained from applying for the lead position because he felt that he would not be considered. Doc. 23-1 at 124.  Plaintiff further states that he overheard other maintenance technicians discussing that "there is going to be an opening soon," which Plaintiff believed to be a reference to Defendant attempting to force his resignation. Doc. 23-1 at 124.

A survey of relevant caselaw reveals that Plaintiff's allegations do not satisfy the strict standard set by the Eleventh Circuit.  The Eleventh Circuit has found no hostile work environment even in cases involving more serious allegations than those in this case and including the use of racial slurs.  *See e.g., Alexander v. Opelika City Schools*, 352 F. App'x 390 (11th Cir. 2009) (finding that recalling eight instances over the course of two years where plaintiff was called "boy" was not enough and affirming summary judgment in favor of defendants, finding that "none of the alleged racial comments contained threats of physical violence, and [plaintiff] did not demonstrate that the comments interfered with his job performance."); *Washington v. Kroger Co.*, 218 F. App'x 822, 825 (11th Cir. 2007) (finding no racially hostile work environment when a co-worker allegedly hung a figurine representing the plaintiff by a rope and called the plaintiff racially-suggestive names, including "boy"); *Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 57–58 (11th Cir. 2005) (finding no hostile work environment even with evidence of "displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a bathroom wall and on a block-saw console, and a noose in another employee's locker[,]" as well as two or three threats to "kick [plaintiff's] 'black ass[,]'" one supervisor calling plaintiff a "nigger" and threatening to "cut" him if he looked at a white girl, and another supervisor calling him "black boy."

Allegations reflected conduct that was "isolated," "sporadic," and "random" and "d[id] not meet the standard of severe and pervasive harassment."); *Quarles v. Con–Way Freight, Inc.*, 2008 WL 1994916, at *7 (M.D. Fla. May 8, 2008) (relying on *Barrow*, found that "six instances of racially-related conduct over a period of a few years" and "approximately four other instances that were reported to [plaintiff]"—which included a supervisor's use of racially offensive terms, using a stuffed animal gorilla to portray a black employee, and being told of a noose that had been shown to another black employee—fell "well short of the required level of severity and frequency to support a hostile environment claim"); *Smith v. Beverly Health & Rehab. Serv., Inc.*, 978 F. Supp. 1116, 1122 (N.D. Ga. June 24, 1997) (a supervisor's comments that "all that mooly can do is make coffee and bring it to me," "these goddamn Georgia niggers think they own Georgia," and "where I come from niggers knew their place," did not rise to the level of severe and pervasive racial harassment).

The Court certainly recognizes that Plaintiff appears to have had a difficult relationship with his former boss; however, "[j]ob performance criticism from a supervisor or manager is a common vicissitude of life in the working world, even if harsh or unjustified." *Pierri v. Cingular Wireless, LLC,* 397 F. Supp. 2d 1364, 1380 (N.D. Ga. 2005). "While the conduct Plaintiff allegedly experienced may be inappropriate in a working environment and may have been unjustified," Title VII does not "operate as 'general civility code[s]' that ensure a workplace free of stress or criticism, justified or not." *Mosley-Coleman v. Potter*, No. CV 309-033, 2009 WL 1811552, at *4 (S.D. Ga. June 24, 2009) (citations omitted); *see also Stoudemire*, 2019 WL 3558040, at *4 ("Comparisons of the severity of different types of workplace misconduct and how best to

47

deal with them are the sort of judgments about which courts must defer to employers. 'Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.'") (internal citations and quotations omitted).   This District has previously held that where a supervisor previously yelled at the plaintiff on numerous occasions, told the plaintiff no one liked her and that she did not belong in the department, made threats of disciplinary action including calling law enforcement, and general behavior mocking the plaintiff, no "reasonable person would objectively find that these comments, while hostile and offensive, were sufficiently hostile or abusive and pervasive to establish a Title VII hostile environment claim." *Herawi v. State of Ala. Dep't of Forensic Scis.*, 311 F. Supp. 2d 1335, 1351 (M.D. Ala. 2004); *see also Paape v. Wall Data, Inc.,* 934 F. Supp. 969, 977 (N.D. Ill. 1996) ("Title VII ... does not operate as a general ban on yelling, swearing, screaming and other rude or offensive behavior."); *Heba v. N.Y. State Div. of Parole,* 537 F. Supp. 2d 457, 468 (E.D.N.Y. 2007) (finding that the employer's angry outbursts were "inappropriate," but they did not "constitute an environment of pervasive hostility and abuse").

Plaintiff's evidence is insufficient to demonstrate there was a racial animus behind the conduct at issue and, even if it did establish a racial animus, it certainly is not enough to demonstrate that the alleged harassment was sufficiently severe and pervasive to establish a hostile work environment claim.   As such, summary judgment in favor of Defendant on Plaintiff's Title VII hostile work environment claim is appropriate.

Case 2:18-cv-00495-WKW-WC   Document 40   Filed 01/06/20   Page 49 of 50

## V.     CONCLUSION

For all of the foregoing reasons, the undersigned Magistrate Judge hereby RECOMMENDS that Defendant's Motion for Summary Judgment (Doc. 21) be GRANTED.  It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **January 21, 2020**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of "plain error if necessary in the interests of justice." 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993)("When the magistrate provides such notice and a party still fails to object to the findings of fact and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 6th day of January, 2020.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
CHIEF UNITED STATES MAGISTRATE JUDGE